UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Monica M. Fox,

       Plaintiff,

       v.                          Civil Action No. 2:11-CV-223

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 9, 14)

      Plaintiff Monica Fox brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her application for disability insurance

benefits. Pending before the Court are Fox's motion to reverse the Commissioner's

decision (Doc. 9), and the Commissioner's motion to affirm the same (Doc. 14). For the

reasons stated below, the Court DENIES Fox's motion, and GRANTS the

Commissioner's motion.

## Background

      Fox was thirty-five years old on her alleged disability onset date of

January 30, 1999. She is insured for social security disability benefits through

December 31, 2004. She has a college education, and has worked as a dispatcher for

local police and fire departments, a security monitor at a resort and a retail store, and a

cook at a senior citizens' home. During portions of the alleged disability period, Fox

worked on a part-time basis; but she testified that she had difficulty with this work due to problems focusing and concentrating, lifting heavy items, standing or sitting for long periods of time, and having limited access to a bathroom. (AR 936-39.) She also testified that fatigue and pain made even part-time work impossible. (AR 936-37.) She has not worked since January of 2003. Fox suffers from chronic aches and pains in virtually every area of her body, and has been diagnosed with fibromyalgia[1], myofascial pain syndrome[2], and depression, among other ailments.

On August 23, 2004, Fox filed an application for disability insurance benefits. Therein, she alleged that she has been unable to work since January 30, 1999 due to fibromyalgia, myofascial pain syndrome, irritable bowel syndrome, chronic sleep fatigue syndrome, and possible arthritis. (AR 151.) She stated that these conditions caused pain in her muscles, ligaments, and tendons; and that she was limited in her ability to stand, lift, walk, and concentrate. (AR 152.) Fox's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on June 14, 2006 by Administrative Law Judge ("ALJ") Robert Klingebiel. (AR 518-43.) Fox appeared and testified, and was represented by an attorney. On July 20, 2006, the ALJ issued a decision finding that Fox was not disabled. (AR 63-68.) Approximately one week later, the Appeals Council vacated that decision and remanded

---

[1] "Fibromyalgia" is defined as "[a] common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances." STEDMAN'S MEDICAL DICTIONARY 725 (28th ed. 2006).

[2] "Myofascial pain syndrome" is "a chronic pain disorder [involving] pressure on sensitive points in [a person's] muscles (trigger points) caus[ing] pain in seemingly unrelated parts of [the] body." Mayo Clinic Staff, *Definition of Myofascial Pain Syndrome*, MAYO CLINIC, Jan. 5, 2012, *http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042* (last visited July 20, 2012).

the case for further proceedings.  (AR 97-100.)  On November 14, 2007, ALJ Klingebiel

held a second hearing, which Fox attended with her attorney.  (AR 544-80.)  Thereafter,

the ALJ issued a second decision finding that Fox was not disabled, and this time the

Appeals Council denied Fox's request for review.  (AR 6-8, 24-33.)  Having exhausted

her administrative remedies, Fox filed a Complaint in this Court on September 19, 2008.

On April 27, 2009, the Court granted the Commissioner's unopposed motion to remand

the case for further proceedings.  (AR 631.)

Based on the Court's April 2009 Order, on January 11, 2010, the Appeals Council

remanded the case to a new ALJ for a third hearing.  (AR 636-41.)  In its Order, the

Appeals Council stated, among other things, that the ALJ was required to: (a) address the

reports of Drs. Hogarty and Cooper and all other relevant medical evidence relating to the

alleged disability period; (b) obtain medical expert testimony from a rheumatologist or

other medical expert familiar with fibromyalgia in order to clarify the nature and severity

of Fox's impairments; (c) make a new finding regarding Fox's physical and mental

limitations, in light of the full record; and (d) re-address the issue of Fox's ability to

perform her past relevant work as a dispatcher.  (AR 640.)  On February 22, 2011, ALJ

Ruth Kleinfeld held a third hearing on Fox's claim, which Fox attended with her attorney.

(AR 916-57.)  On April 25, 2011, the ALJ issued a decision finding Fox not disabled.

(AR 598-614.)  Fox did not request review by the Appeals Council within the required

thirty days, and thus, on August 5, 2011, the Appeals Council notified Fox that it would

not review her case, making the ALJ's decision the final decision of the Commissioner.

(AR 581-83.)  Again having exhausted her administrative remedies, Fox filed the Complaint in this action on September 15, 2011.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945.  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Kleinfeld first determined that, although Fox had worked after the alleged disability onset date, this work did not rise to the level of substantial gainful activity. (AR 601.) At step two, the ALJ found that Fox had the severe impairment of fibromyalgia. (*Id.*) Conversely, the ALJ found that Fox's other medically-determinable impairments – including rosacea, sinusitis, bronchitis, an respiratory infection, menorrhagia, an endometrial polyp, an endometrial fibroid, vaginitis, a hemorrhagic left ovarian cyst, rib pain, left lateral epicondylitis, irritable bowel syndrome, tubal ligation, hypertension, hypercholesterolemia, recurrent lesions between her toes, environmental allergies, temporomandibular joint disorder, headaches, constipation, and diarrhea – were non-severe, given that these impairments either did not meet the durational requirements of the Social Security Act or did not significantly limit Fox's ability to perform basic work-related activities. (AR 602.) After discussing the relevant portions of the record in detail, and applying the four broad functional areas set forth in the regulations for evaluating mental disorders and in section 12.00C of the Listings, the ALJ also found that Fox's anxiety and depression were non-severe. (AR

603-08.)  At step three, the ALJ found that none of Fox's impairments, alone or in

combination, met or medically equaled a listed impairment.  (AR 609.)

Next, the ALJ determined that Fox had the RFC to perform the full range of light

work, as defined in 20 C.F.R. § 404.1567(b).  (AR 609.)  Given this RFC, and relying on

testimony from the vocational expert ("VE"), the ALJ found that, through her date last

insured, Fox was capable of performing her past relevant work as a dispatcher, which job

Fox had described as being performed at the sedentary level.  (AR 613.)  Alternatively,

the ALJ found that Medical-Vocational Rule 202.21 directed that there were other jobs

existing in the national economy that Fox was able to perform.  (AR 613-14.)  The ALJ

concluded that Fox had not been under a disability from her alleged disability onset date

of January 30, 1999 through her date last insured of December 31, 2004.  (AR 614.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

### I.     Compliance with Appeals Council Order

As noted above, the Appeals Council ordered that, on remand, the ALJ should "obtain medical testimony from a rheumatologist or other medical expert familiar with fibromyalgia that specifically addresses [Fox's] likely degree of functional restriction prior to December 30, 2004, in order to clarify the nature and severity of [Fox's] impairment(s)." (AR 640 (citations omitted).) Fox claims that, by seeking medical

testimony from Dr. Charles Plotz, the ALJ did not comply with this portion of the Appeals Council's Order. The Court disagrees.

There is no dispute that Dr. Plotz is a rheumatologist. His resume, which is part of the record, indicates that he is a Master in the American College of Rheumatology and received a Gold Medal award from the American College of Rheumatology. (AR 656; *see* AR 921.) At the administrative hearing, Dr. Plotz testified that most of his work is in the area of rheumatology, and he is "completely familiar" with fibromyalgia, including the diagnostic criteria for fibromyalgia as promulgated by the American College of Rheumatology. (AR 921.) Dr. Plotz further testified that he has had patients who had fibromyalgia at such a severe level that they could not work, and that he recognized that fibromyalgia could be a disabling condition. (AR 932-33.) Nonetheless, noting that Fox's medical record contains not only symptoms consistent with fibromyalgia but also "a myriad of complaints which have nothing to do with [f]ibromyalgia and with words that negate it," Dr. Plotz opined that Fox had "Hypochondriasis," a psychiatric disorder characterized by excessive preoccupation about having a serious illness. (AR 930-31.) Fox seems to argue that Dr. Plotz was not a proper medical advisor because he questioned whether Fox had fibromyalgia, instead diagnosing her with a mental disorder. But the Appeals Council did not order the ALJ to obtain testimony from a medical advisor who would testify in favor of Fox, or even one who would confirm that Fox had fibromyalgia; rather, the Council ordered the ALJ to obtain testimony from a medical advisor who was familiar with fibromyalgia and could testify about the nature and severity of Fox's impairments. The evidence demonstrates that Dr. Plotz was familiar

with fibromyalgia and was able to testify about the nature and severity of Fox's impairments, including her fibromyalgia symptoms.

Fox's remaining arguments regarding Dr. Plotz – including her claim that Dr. Plotz improperly found that Fox may not have had fibromyalgia but instead had hypochondriasis – lack merit, because the ALJ gave Dr. Plotz's opinion "little to no weight" and instead found that, not only did Fox have fibromyalgia, but it rose to the level of a "severe" impairment. (AR 601-02.) Conversely, in the cases cited by Fox in support of this argument (*see* Doc. 9 at 24 n.15), the ALJs' decisions heavily relied on Dr. Plotz's opinions. *See, e.g., Minsky v. Apf*el, 65 F. Supp. 2d 124, 139 (E.D.N.Y. 1999) ("[i]t is obvious that the ALJ based his ultimate findings, to a great extent, on the testimony of Dr. Plotz, which the ALJ cited throughout his decision"); *Burnette v. Bowen*, 702 F. Supp. 47, 50 (E.D.N.Y. 1988) ("the [ALJ] and the Appeals Council relied heavily on the testimony of Dr. Plotz, the medical advisor"); *San Filippo v. Sec'y of Health and Human Servs.*, 564 F. Supp. 173, 175 (E.D.N.Y. 1983) ("the ALJ relied solely on the opinion of a medical advisor, Dr. Plotz"). Fox is incorrect that, in determining that Fox had the RFC to perform light work, the ALJ "relied" on Dr. Plotz's testimony. (Doc. 9 at 22.) The ALJ's decision explicitly states that, in making her RFC determination, the ALJ relied on the medical opinion of agency consultant Dr. Geoffrey Knisely (discussed below), not on the opinion of Dr. Plotz. (*See* AR 611.)

Fox further argues that the ALJ erroneously credited some aspects of Dr. Plotz's testimony while discounting others. But this was not legal error: ALJs are entitled to accept certain portions of medical opinions while rejecting others. *See Veino v. Barnhart*,

312 F.3d 578, 588 (2d Cir. 2002); *Carpenter v. Astrue*, No. 5:10-cv-249, 2011 WL 3951623, at *6 (D. Vt. Sept. 7, 2011) ("It is permissible for an ALJ to reject certain findings of a provider while affording 'great weight' to others."). Moreover, Fox does not allege, and the Court does not find, that any harm was caused by the ALJ's decision to "adopt" Dr. Plotz's testimony that Fox's impairments did not meet or medically equal a listing, as the evidence does not indicate that her impairments met or medically equaled a listing.

Fox also claims that the ALJ did not comply with the Appeals Council's directive that, on remand, the ALJ should ask hypothetical questions to the VE which would "reflect the specific capacity/limitations established by the record as a whole." (AR 640.) At the administrative hearing, however, the VE testified that, assuming Fox could perform sedentary work with no limitations, she would be able to perform her past relevant work as a dispatcher. (AR 949.) Because the ALJ found that Fox had the RFC to perform the full range of light work, which would subsume an RFC to perform sedentary work, there was no need for the ALJ to pose hypothetical questions to the VE. *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983) ("Because there was substantial evidence to support the [Commissioner's] conclusion that Dumas retained the [RFC] for sedentary work, the ALJ rightfully removed that issue from the vocational expert's consideration. The vocational expert is just that, a vocational expert. The ALJ is responsible for determining, based on all the evidence, the claimant's physical capabilities."). The ALJ alternatively found that Fox could perform other jobs existing in the national economy, but she was not required to question the VE on this finding either,

given that she relied on Medical-Vocational Rule 202.21 in support thereof.  *See Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) (it is only in cases where "a claimant's nonexertional impairments significantly diminish his ability to work . . . so that he is unable to perform the full range of employment indicated by the medical[-]vocational guidelines" that the ALJ must introduce the testimony of a vocational expert that the claimant is able to perform other jobs existing in the economy).

Finally, Fox contends that the ALJ did not follow the Appeals Council's Order with respect to the medical opinions of Suneya Hogarty, DO and Sarah Kenealy, RN, LCMHC.  The ALJ's substantive analysis of these opinions is discussed below.

## II.    Analysis of Medical Opinions

Fox asserts that the ALJ erred in her analysis of the medical opinions, including those of treating physicians and other providers, and those of examining and non-examining providers.  Specifically, Fox finds fault with the ALJ's handling of the medical opinions of treating providers Sheldon Cooper, MD; Suzanne Burgos, PA-C; Sarah Kenealy, RN, LCMHC; and Suneya Hogarty, DO; and non-examining agency consultant Geoffrey Knisely, MD.  For the foregoing reasons, the Court finds that the ALJ did not err in her analysis of each of these opinions, and substantial evidence supports the ALJ's findings regarding her allocation of weight thereto.

### A.    Applicable Law

Under the "treating physician rule," a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 567-69 (2d Cir. 1993). Even when a treating physician's opinion is not given controlling weight, the opinion is still entitled to *some* weight because a treating physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence . . . ." 20 C.F.R. § 404.1527(c)(2). When the ALJ decides to afford less than controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining how much weight is appropriate: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) whether the treating physician presents relevant evidence to support an opinion, particularly medical signs and laboratory findings; (4) whether the treating physician's opinion is consistent with the record as a whole; (5) whether the treating physician is a specialist in the area relating to her opinion; and (6) other factors which tend to support or contradict the opinion." *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); 20 C.F.R. § 404.1527(d)(2)-(6)); *see* 20 C.F.R. § 404.1527(d). After considering these factors, the ALJ must "give good reasons" for the weight afforded to the treating source's opinion. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quotation marks and citation omitted).

     ALJs are not required to afford the same level of deference to the opinions of "other sources" as they are to the opinions of "acceptable medical sources," including

treating physicians.  *See* 20 C.F.R. § 404.1513(a), (d).  "Acceptable medical sources" are

defined in the regulations to include licensed physicians (including medical and

osteopathic doctors), psychologists, optometrists, podiatrists, and qualified speech-

language pathologists, 20 C.F.R. § 404.1513(a); whereas sources such as nurse

practitioners, physicians' assistants, chiropractors, and therapists are defined as "other

sources," 20 C.F.R. § 404.1513(d)(1).  The Second Circuit explained that, "while the ALJ

is certainly free to consider the opinions of . . . 'other sources' in making his overall

assessment of a claimant's impairments and residual abilities, those opinions do not

demand the same deference as those of a treating physician."  *Genier v. Astrue*, 298 F.

App'x 105, 108 (2d Cir. 2008) (citation omitted).

Nonetheless, ALJs must evaluate the opinions of "other sources" in some depth:

"Opinions from these [other] sources . . . who are not technically deemed 'acceptable

medical sources' under our rules, are important and should be evaluated on key issues

such as impairment severity and functional effects, along with the other relevant evidence

in the file."  SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).  ALJs are thus

required to use the same factors to evaluate the opinions of "other sources" as they are

required to use to evaluate the opinions of "acceptable medical sources," including

treating physicians.  *Id.* at *4 (citing 20 C.F.R. § 404.1527(d)).  As noted above, these

factors include but are not limited to the length of the treatment relationship, the

frequency of evaluation, and the degree to which the medical source provided evidentiary

support for his or her opinion.  *Id.*

## B.     Dr. Cooper

In March 2005, Dr. Cooper, a rheumatologist, saw Fox "for recommendations regarding probable fibromyalgia."  (AR 355.)  Dr. Cooper recorded that Fox reported to him that she was diagnosed with fibromyalgia in 2000; she was unable to complete simple tasks; her mind was not working well; and she had not worked for over a year.  (*Id.*)  Skin, cardiac, neurologic, and musculoskeletal examinations all revealed normal findings, except Dr. Cooper noted that Fox had multiple and severe fibromyalgia tender points.  (AR 356-57.)  The Doctor "reassured [Fox] that overall her musculoskeletal exam and system [we]re normal, but she d[id] have tight muscles because of inflexibility and lack of exercise over a long period of time."  (AR 357.)  Dr. Cooper strongly advised that Fox exercise, attend counseling sessions, consider using anti-anxiety medication, and consider using Tylenol or acetaminophen instead of narcotic medication for pain control.  (*Id.*)  He further advised that Fox should "stay engaged," noting that, although he did not think she could work "at this point," "eventually she may be able to return to work" within "months to perhaps even years."  (*Id.*)

The ALJ summarized Dr. Cooper's treatment notes in detail (AR 604, 606-07, 611), and gave the Doctor's opinions regarding Fox's mental impairments and inability to work "little to no weight" on the following grounds: (1) Dr. Cooper did not specialize in psychological conditions; (2) Dr. Cooper made his opinions after having only one appointment with Fox; and (3) Dr. Cooper's opinions were not consistent with what Fox described as her activities and with the Doctor's own recommendations (AR 607, 611).  These were proper factors for the ALJ to consider in weighing Dr. Cooper's opinions, *see*

*Roma v. Astrue*, 468 F. App'x 16, 18 (2d Cir. 2012); 20 C.F.R. § 404.1527(c); and

substantial evidence supports the ALJ's findings. First, Dr. Cooper did not specialize in

psychology; his treatment notes show that he specialized in rheumatology and clinical

immunology. (*See, e.g.,* AR 358.) Therefore, it was appropriate for the ALJ to afford

less weight to his opinion regarding Fox's mental condition. Second, at the time Dr.

Cooper made these opinions, he had only seen Fox once, and thus the opinions were

entitled to less weight than they would have been had Dr. Cooper been treating Fox on an

ongoing basis. *See Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a

"treating physician" as "[a] claimant's . . . own physician . . . who has provided the

[claimant] with medical treatment or evaluation and *who has or had an ongoing*

*treatment and physician-patient relationship with the individual*") (emphasis added);

*Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who see a patient

only once or twice do not have a chance to develop an ongoing relationship with the

patient and thus are generally not considered treating physicians). Fox points out that Dr.

Cooper ultimately treated her on more than one occasion; however, the fact remains that

at the time Dr. Cooper gave his relevant opinions, he had only seen Fox once and thus did

not have an "ongoing treatment relationship" with her.

Finally, the ALJ accurately stated that Dr. Cooper's opinions were inconsistent

between what Fox described as her activities and the Doctor's recommendations.

Specifically, although Dr. Cooper's March 2005 treatment note documented Fox's

reporting that activities such as vacuuming for twenty minutes, water-skiing, and snow-

shoeing exacerbated her pain and she had difficulty completing simple tasks, Dr. Cooper

stated that it was Fox's lack of exercise and inflexibility that caused her to have tight muscles, and thus he opined that it was "very, very important" that Fox engage in an exercise program, indicating his belief that Fox was able to do at least a minimal level of physical activity, including "work[ing]" on a treadmill, walking her puppy, and doing yoga. (AR 357.) As noted by the ALJ, approximately one year later, Dr. Cooper stated in a May 2006 treatment note that, although Fox had suffered what was likely a panic attack and reported significant joint pain and fatigue, she was "in good spirits" and was walking on the treadmill, doing "pool work," and walking her two dogs. (AR 411.) The Doctor again advised Fox about "all the benefits of exercise and how she should slowly but consistently increase the intensity level." (AR 412.) Approximately one year after that, Dr. Cooper again encouraged Fox to "be more active," the goal being to "get to a point where [she could] be able to engage in more vigorous exercise." (AR 511.) Dr. Cooper documented in his treatment note at that time (August 2007) that Fox was "in good spirits," and was enjoying gardening, caring for her house, and doing cookouts with her husband. (AR 510.) Dr. Cooper did not make any opinions in his May 2006 and August 2007 treatment notes about Fox's ability to work.

### C.    PA-C Burgos

Fox claims that the ALJ also erred in giving "little weight" (AR 612) to the opinion of her primary care provider, Physician's Assistant Burgos. Burgos opined in June 2006 that Fox's myofascial pain disorder and fibromyalgia significantly limited her ability to function. (AR 431-34.) Burgos stated that Fox was limited in her ability to lift/carry and push/pull; could stand and/or walk for less than two hours in an eight-hour

workday; and was required to "periodically alternate sitting and standing to relieve pain or discomfort." (AR 431-32.) The ALJ stated the following reasons for her decision to afford little weight to this opinion: (1) Burgos's opinion "was rendered almost 18 months after the date last insured, and Ms. Burgos did not indicate that it was applicable to th[e alleged disability] period"; (2) Fox was treated primarily by rheumatologists, and not her primary care provider, which Burgos was; (3) Burgos saw Fox only approximately four times per year since January 2002, which frequency did not correlate with the significant limitations opined by Burgos; and (4) Burgos noted that the disability forms were completed with Fox's assistance and requested that Fox come in for a physical examination, which ended up being normal other than subjective myofascial pain. (AR 612.)

Like with Dr. Cooper, the ALJ considered the relevant factors in analyzing Burgos's opinion. Specifically, it was proper for the ALJ to consider that Burgos's opinion was rendered long after the date last insured, and that Burgos did not make any opinion on Fox's condition during the alleged disability period. *See Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999) (citing *Jones v. Sullivan*, 949 F.2d 57, 59-60 (2d Cir. 1991)) (a retrospective opinion may be used to support the existence of a disability only when that opinion clearly refers to the disability period and not when the opinion "simply express[es] an opinion as to the claimant's current status"). Next, it was proper for the ALJ to consider that Burgos did not treat Fox as frequently as would seem to be required if Fox had the significant limitations which Burgos opined she had. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more

times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").  It was also proper for the ALJ to consider that Burgos was a primary care practitioner rather than a specialist.  *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Lastly, it was appropriate for the ALJ to consider Burgos's June 2006 notation that she would have preferred to have had Fox objectively tested through a functional capacity examination before having to complete disability paperwork.  (AR 611 (citing AR 416).) All of these factors, along with the fact that Burgos was a physician's assistant and not a physician or psychologist, weigh against affording significant weight to Burgos's opinion.

### D.  NP/Counselor Kenealy

Fox also argues that the ALJ erred in her analysis of Nurse Kenealy's opinions. Kenealy opined, in part, that Fox's ability to work was "compromised" by her fibromyalgia, myofascial pain syndrome, and depressive disorder (AR 392), and that Fox's pain would "markedly impact [her] ability to function" if she was experiencing an "acute episode of pain" (AR 408).  The ALJ's primary reason for affording "little weight" to these opinions (which the ALJ discussed at length in her decision) was that Kenealy "did not begin treating [Fox] until after the date last insured" and her opinions were rendered "almost 18 months after that date."  (AR 607.)  It is true that Nurse Kenealy did not begin treating Fox until after the date last insured.  Specifically, Fox's date last insured was December 31, 2004, and Nurse Kenealy did not begin treating Fox

until almost three months later, on March 18, 2005.  (AR 348, 392.)  More significantly, Kenealy did not relate her opinions back to the alleged disability period, and in fact used the present tense when describing Fox's symptoms, indicating that she was referring to Fox's condition during treatment, i.e., after the date last insured.  (*See, e.g.,* AR 392 ("Fox *is* . . . dealing with a major depressive disorder"; "She *is* in constant pain"; "She *is* unable to sit comfortably"; "Her ability to care for herself and her family *is* compromised, her ability to work *is* compromised") (emphases added); AR 409 ("many days [Fox] *is* not able to perform <u>basic</u> [activities of daily living] due to her pain level") (first emphasis added).)  As stated above, it is proper for an ALJ to give less weight to a medical opinion that was made after the alleged disability period ended and does not refer to the relevant period.  *See Vitale v. Apfel*, 49 F. Supp. 2d at 142 (citing *Jones v. Sullivan*, 949 F.2d at 59-60).  Furthermore, Nurse Kenealy's treatment of Fox appears to have involved not only problems which existed during the insured period but also problems which arose after that period ended.  For example, Nurse Kenealy recorded in her first appointment with Fox that her mother had passed away two months earlier, contributing to Fox's depression.[3]  (AR 348.)

---

[3]  In a footnote, Fox accurately points out that the ALJ erred when she stated that Kenealy was not qualified to assess Fox's pain because she was a specialist in psychological rather than physical symptoms.  (Doc. 9 at 28 n.16 (citing AR 607).)  The record clearly demonstrates that Kenealy was both a nurse and a mental health counselor, and thus was qualified to assess both Fox's mental and physical impairments.  The ALJ's error is harmless, however, given that her primary reason for discounting Kenealy's opinion – Kenealy's failure to treat Fox during the relevant period – is legally proper and supported by the record; and Fox has failed to demonstrate that the error affected any other aspect of the ALJ's decision.

### E.    Dr. Hogarty

In January 2004, Dr. Hogarty, a rheumatologist, saw Fox in follow-up for her fibromyalgia and injected five trigger points with Marcaine, a local anesthetic.  (AR 464.) The Doctor noted that Fox had not been in for an appointment for six-to-nine months. (*Id.*)  She also noted that, although Fox was "pretty happy with her medical regimen," she was "having more frequent flares, as [Fox] puts it, and she [wa]s discouraged by her lack of ability to engage in any steady work that can provide her some income."  (*Id.*)  Dr. Hogarty recorded that Fox believed that "most of her current difficulties stem from emotional stress about financial issues."  (*Id.*)  The ALJ described Dr. Hogarty's treatment notes, and stated that Dr. Hogarty diagnosed fibromyalgia in flare, recommended wrist splinting at night and possibly during the day, and "did 'not see any evidence of inflammatory arthritis or even carpal tunnel.'"  (AR 601 (quoting AR 252).) The ALJ also stated that Dr. Hogarty "did not otherwise restrict [Fox's] activities."  (AR 601.)

> The ALJ properly did not place a particular value on Dr. Hogarty's treatment notes, given that the Doctor did not make any opinions or conclusions therein (or elsewhere) regarding Fox's functional or mental abilities.  Instead, the record demonstrates that Dr. Hogarty merely recorded Fox's reporting about her symptoms; treated Fox with trigger point injections, pain medications, and osteopathic manipulation; and discussed the disability benefits process with Fox. (AR 251-56, 464.)  For example, Dr. Hogarty's August 26, 2004 treatment note states, under the section titled "History of Present Illness": [Fox] reports three months . . . of wrist and hand pain that she states is excruciating. . . .  She also is having some left knee and left ankle . . . pain.  She reports that her knee pain is sharp in nature, radiating down from her hip at times, and causes her to have significant pain in her knee.  She does have some pain that wakes her up at night in the knee and in the hands and wrists.  Her ankle pain is worse when she walks, but "hurts all the time."

[Fox] reports that she has decreased grip in her hands and has had compromise of all of her ADLs. She is unable to drive herself without having a lot of pain, cook[,] or dress herself. . . . She is actually applying for disability currently because she reports that she is unable to do much of anything.

(AR 251.) The ALJ was not obligated to assign weight to treatment notes such as this, which made no assessments or opinions about Fox's functional or mental abilities. Accordingly, the Court rejects Fox's assertion that the ALJ erred in "fail[ing] to evaluate Dr. Hogarty's assessment of limited activities of daily living." (Doc. 9 at 29.)

## F. Agency Consultant Dr. Knisely

Finally, Fox asserts that the ALJ erred in giving great weight to the opinion of non-examining agency consultant Dr. Knisely. In December 2004, Dr. Knisely affirmed the October 2004 physical RFC assessment prepared by non-examining agency consultant Dr. Christine Conley. (AR 311.) Dr. Conley's assessment reviewed medical evidence of Fox's fibromyalgia and pain (AR 305), as well as evidence of Fox's daily activities and work history (AR 309). Drs. Conley and Knisely opined that Fox could lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and push or pull without limitation. (AR 304.) The ALJ gave "great weight" to this opinion "because it is supported by the objective medical evidence and [Fox's] own statements regarding her activities of daily living (e.g., meal preparation, grocery shopping for two to three hours at a time once a week, doing light cleaning, and doing laundry)." (AR 611.)

Fox argues that the ALJ should have specifically identified how Dr. Knisely's opinion was consistent with the medical evidence. (Doc. 9 at 26.) But Dr. Knisely's

assessment itself identifies at least some of the relevant medical evidence, including: evidence that Fox sought treatment for pain in December 2000, at which point she had full range of motion of the cervical spine and shoulders, no impingement signs, and a normal shoulder x-ray (AR 305; *see* AR 261-64); evidence that Fox had a normal MRI (AR 305; *see* AR 259); evidence that Fox presented with eight tender points in February 2001 and had trigger point injections in early 2004, which provided relief (AR 305; *see* AR 255, 257-60); and evidence that in August 2004 Fox complained of wrist, knee, and ankle pain, but her examination was normal with no evidence of carpal tunnel, negative Tinel's and Phelan's signs, no effusions or joint swelling, and normal range of motion of all joints (AR 305; *see* AR 251-54). The assessment also specifically identifies relevant non-medical evidence, including the statements of Fox's former employers that she had no problems working during the years 1996 through 1999 and 2002, and that she told her employers that she left the jobs she had during those years not due to medical problems but because her husband was relocating and because she wanted to take a private job, respectively. (AR 309; *see* AR 159-60, 169-70.) The assessment also referred to Fox's Function Report, noting that she was able to do light housework, drive, shop, and cook. (AR 309; *see* AR 133-34.)

Fox further argues that the ALJ should have considered medical records submitted in 2006 in conjunction with the ALJ's analysis of Dr. Knisely's opinion. (*See* Doc. 9 at 26 (referring to AR 435-65).) As the Commissioner points out, however, many of these records are from psychiatric providers regarding treatment for Fox's mental problems (*see, e.g.,* AR 439, 447, 452, 457-58, 462), and thus would not have influenced Dr.

Knisely's opinion regarding Fox's physical functioning. Moreover, the ALJ's decision clearly demonstrates that she was aware of and considered these records in determining Fox's RFC. (*See* AR 610-11 (citing Exhibit "21F" multiple times and specifically discussing medical records contained within that Exhibit).) Furthermore, Fox fails to argue with any specificity how these records would have affected Dr. Knisely's opinion. She asserts merely that the ALJ erred in failing to "explain how [Dr. Knisely's] opinion should be viewed in light of medical records submitted in 2006 relating to the period 2001 to 2004." (Doc. 9 at 26.) In her Reply, Fox adds that:

> Absent from [Dr. Knisely's] summary of the medical evidence, in addition to those records contained in Exhibit 21F [(AR 435-65)], is any mention of Ms. Fox's receiving chiropractic treatment for fibromyalgia symptoms from May, 2003, to November, 2004 (Tr. 328-329) or her reports to her primary care provider about fibromyalgia flares on June 19, 2003 (Tr. 229) or January 6, 2004 (Tr. 228).

(Doc. 17 at 8.) It is unclear how six months of chiropractic treatment and reports of fibromyalgia flares on two occasions within a six-month period would have affected Dr. Knisely's opinion. Dr. Conley's assessment reveals that she and Dr. Knisely were aware that Fox had fibromyalgia flares (*see* AR 305), and the fact that she sought chiropractic treatment to address those flares would likely come as no surprise to them. The assessment also demonstrates that Drs. Conley and Knisely were aware of Fox's shoulder pain and tender trigger points, as well as her receipt of trigger point injections to address her pain. (*Id.* (referring to AR 255, 257-61).)

Fox further asserts that Dr. Knisely's opinion was based on myofascial pain syndrome and not fibromyalgia (*see* Doc. 17 at 8), but she offers no support for this argument. The argument is easily dismissed, given that Dr. Conley's assessment

discusses Fox's fibromyalgia symptoms and trigger point injections for relief of those

symptoms, and specifically refers to a 2001 diagnosis of "fibromyalgia." (AR 305.) In

any event, it is not the mere diagnosis of fibromyalgia – or any other particular condition

or disorder – that is significant; it is the severity of the symptoms and the limitations

caused by the condition or disorder that matters most for purposes of the disability

analysis. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (holding that

mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and

limitations does not mandate a finding of disability).

Although in many cases it is most appropriate for ALJs to give less weight to the

opinions of non-examining agency consultants than to those of treating physicians and

other treating providers, this determination must be made on a case-by-case basis, and the

regulations clearly permit the opinions of non-examining agency consultants to override

those of treating sources, when the former are supported by evidence in the record and

the latter are not. *See* SSR 96-6p, 1996 WL 374180, at *3 (1996) ("In appropriate

circumstances, opinions from State agency . . . consultants . . . may be entitled to greater

weight than the opinions of treating or examining sources."); 20 C.F.R. §

404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly

qualified physicians, psychologists, and other medical specialists who are also experts in

Social Security disability evaluation."). In this case, the Court finds that it was proper for

the ALJ to give more weight to the agency consultant's opinion than to those of Fox's

treating providers.

## III.    Severity of Depression

Fox contends that the ALJ erred in finding that her depression was not a severe impairment.  The regulations define a "severe" impairment as one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c); *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010).  The Social Security Administration has described the claimant's burden of demonstrating a "severe" impairment as follows:

> [A]t the second step of [the] sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any [substantial gainful work].  An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

SSR 85-28, 1985 WL 56856, at *3 (1985).

Here, the ALJ thoroughly considered whether Fox's depression was severe during the alleged disability period, discussing in detail medical treatment notes, opinion evidence, and Fox's own statements.  (AR 603-08.)  Nonetheless, Fox argues that the evidence "clearly documents that [Fox's] depression is more than a slight abnormality." (Doc. 9 at 28.)  Specifically, Fox claims that treatment records from Dr. Katz, who treated Fox's depression from 2001 until 2003, indicate that Fox's depression was severe. But the ALJ accurately discussed this particular evidence in her decision, stating as follows:

[I]n October 2001, [Fox] told Dr. Patel that she had begun treatment with Dr. Katz in psychiatry and felt that her depressive symptoms and anxiety were much better controlled since staring medication. Dr. Patel also concluded that she was "much improved." Also in October 2001, [Fox] told her treating nurse practitioner that she was "quite pleased" with her anti-depressant medication and that it had "lifted her right out of the depression." Although she described some fibromyalgia pain, she said that all depressive symptoms (e.g., insomnia, crying jags, suicidal ideation) had subsided and she was sleeping well at night. The nurse practitioner wrote that [Fox] was "engaging easily in conversation, smiling spontaneously, telling jokes" and had "a full range of affect." In February 2002, [Fox] was doing well, and her psychiatrist wrote that her major depressive disorder was in partial remission. Several months later, in May 2002, [Fox] stated that this was "the best regimen she has been on for years;" her energy level, concentration, and sleep were "okay," and there was no anhedonia. She had just returned from vacationing in Florida and missed it. [Fox's] major depressive disorder continued to be in partial remission. By August 2002, her major depressive disorder was in full remission with "no impairment, little concern." Symptoms were interfering with usual activity "not at all." [Fox] had recently moved and [was] "finding a lot of friends/support" and was looking for a new job. In November 2002, [Fox] described liking her new job and worsening fibromyalgia symptoms. The psychiatrist wrote that she had minimal agitation and estimated that symptoms mildly interfered with activity, but concluded that her major depressive disorder continued to be in full remission and recommended no change in medication. Appetite, sleep, mental energy, and concentration were fine.

In January 2003, [Fox's] depression was responding well to medication . . . . Two months later, in March 2003, [Fox] was "doing well," and symptoms did not interfere with activity at all. She reported not sleeping well, but this was due to her stopping smoking. The psychiatrist wrote that he was considering transferring her care to the primary care provider. In April 2003, [Fox] vacationed in Hilton Head. May 2003 psychiatric notes indicate, with the exception of one stressful weekend, that things were "going okay." [Fox's] major depressive disorder continued to be in full remission, and it was not interfering with usual activity at all. The psychiatrist continued the current medications and transferred [Fox's] care to her primary care provider. [Fox's] treating physician's assistant, Suzanne Burgos, PA-C, did not make any reference to depression or other mental conditions in treatment records for the period June 2003 through December 2004.

(AR 603-04 (citations to record omitted).) The record, which the ALJ properly cited throughout these paragraphs, supports the ALJ's summary of the facts. (*See, e.g.,* AR 200-17, 225-29, 360, 420-23, 441, 465.) The ALJ also accurately stated that Fox "did not

generally complain of psychiatric issues to her rheumatologists in 2004, except in January 2004 when she said 'that most of her current difficulties stem from emotional stress about financial issues.'" (AR 604 (citing AR 464).)

Given this record, the Court finds that Fox's depression had no more than a minimal effect on her ability to perform basic work activities during the alleged disability period, and thus the ALJ did not err in finding that Fox's depression was not a severe impairment.

## IV.    Consideration of Symptoms of Pain and Fatigue

Lastly, Fox argues that the ALJ failed to properly evaluate her symptoms of pain and fatigue. "In consideration of a claimant's subjective accounts of how her level of pain affects her ability to work, an ALJ will evaluate the claimant's statements in relation to the objective medical evidence." *Armstrong v. Comm'r of Soc. Sec.*, No. 1:06-CV-1049, 2009 WL 2883046, *4 (N.D.N.Y. Sept. 4, 2009). If the claimant's statements about pain are not substantiated by the objective medical evidence, the ALJ must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms. SSR 96-7p, 1996 WL 374186, *4 (July 2, 1996). The ALJ must then make a finding on the credibility of the claimant's statements about symptoms and their functional effects. *Id.* "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.*

Here, the ALJ explicitly acknowledged Fox's allegations of pain, stating as follows in her decision: "On August 26, 2004, [Fox] told her rheumatologist . . . that she .

. . is unable to do much of anything, describing excruciating wrist and hand pain of three months' duration, lower extremity pain, decreased hand grip, and irritable bowel syndrome symptoms" (AR 601 (quotation marks omitted)); "[Dr. Cooper] noted that [Fox] continued to have significant joint pain" (AR 602); "[Fox told Nurse Kenealy in March 2005] that she had pain [and] impaired sleep" (AR 604-05); and "[Fox] alleges that she suffers pain every day, including multiple trigger points consistent with fibromyalgia as well as joint and rib pain" (AR 610). The ALJ also acknowledged Fox's complaints of fatigue, stating for example: "[In February 2001], poor quality of sleep was reported to be the most troublesome complaint." (AR 601.)

Nonetheless, the ALJ found that Fox's statements concerning the intensity, persistence, and limiting effects of her symptoms of pain and fatigue were not entirely credible. (AR 610.) In making this finding, the ALJ explicitly considered the entire case record, and gave specific reasons in support thereof. For example, the ALJ accurately noted that, despite Fox's allegations of constant disabling pain, the record demonstrates that during the alleged disability period, the severity of symptoms varied such that Fox occasionally experienced "flare-ups of symptoms." (*Id.*) As discussed earlier, the ALJ also accurately noted that, despite Fox's testimony that she could not work, her employer during the alleged disability period "was not aware of any performance issues and said that she had stopped working there in order to take 'a private job.'" (*Id.* (citing AR 159).) The ALJ also accurately stated that medical records documented that Fox's sleep was "significantly improved" with medication. (AR 601 (citing AR 443, 453).)

Furthermore, citing to the relevant evidence, the ALJ found that Fox's reported activities of daily living included working part-time, doing light cleaning and laundry, shopping, gardening, socializing with friends and family members, and travelling on vacation.  (AR 605, 610.)  The ALJ noted that "[Fox's] former boss wrote that she had no problem with cooperating with co-workers."  (AR 606.)  The record supports these findings.[4]  (*See, e.g.,* AR 449, 453, 460, 464.)  Fox argues that the ALJ placed too much weight on her "limited activities of daily living."  (Doc. 9 at 30.)  However, it was proper for the ALJ to consider these daily activities in making her credibility determination.  The Second Circuit has held that, although "a claimant need not be an invalid to be found disabled," *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), "in assessing the credibility of a claimant's statements, an ALJ must consider . . . the claimant's daily activities," *Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009); *see* SSR 96-7p, at *3, 5-6.

Finally, in support of her argument regarding the ALJ's consideration of her pain and fatigue symptoms, Fox refers to alleged errors in the ALJ's consideration of Nurse Kenealy's, Dr. Plotz's, and Dr. Hogarty's opinions.  As discussed above, the Court finds no error with respect to the ALJ's assessment of these opinions.

In sum, the record reflects that, during the alleged disability period, although Fox experienced pain and fatigue, her symptoms were controlled with medication; she did not require intensive treatment, counseling, or hospitalization; and she was able to engage in

---

[4]  The ALJ also noted that a February 2007 evaluation prepared by psychiatrist Dr. James Stone indicated that Fox's "reported activities included gardening, canning, watching sports on TV, reading, working out on the treadmill for 15 minutes three times a week, and playing games periodically with friends."  (AR 608 (citing AR 470-72).)

many daily activities. The Second Circuit has explained that "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983); *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("The mere fact that working may cause pain or discomfort does not mandate a finding of disability."). The record here supports the ALJ's determination that Fox's impairments did not preclude any substantial gainful employment during the alleged disability period.

## Conclusion

For these reasons, the Court finds that ALJ Kleinfeld complied with the Appeals Council's January 2010 Order, and thoroughly and carefully applied the law to the facts. Although there are multiple treating provider opinions, most were prepared after the date last insured and contain no retrospective component. Moreover, these opinions are almost exclusively based on Fox's subjective self-reporting regarding her pain and inability to function, which self-reporting the ALJ supportably found was not entirely credible, given Fox's activity level during the alleged disability period. Accordingly, the Court DENIES Fox's motion (Doc. 9), GRANTS the Commissioner's motion (Doc. 14), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 30th day of July, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge